J-S77017-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMES ARTHUR A. MCQUEEN | |
| Appellant | No. 12 EDA 2014 |

Appeal from the Judgment of Sentence January 8, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003799-2011

BEFORE:  STABILE, J., JENKINS, J., and STRASSBURGER, J.[**]

MEMORANDUM BY JENKINS, J.:          **FILED DECEMBER 22, 2014**

A jury convicted Appellant James McQueen of rape, involuntary deviate sexual intercourse, unlawful contact with a minor, endangering the welfare of a child, indecent assault and corruption of minors[1].  The court sentenced Appellant to an aggregate sentence of 32½-65 years' imprisonment. Appellant filed timely post-sentence motions which were denied by operation of law.  Appellant filed a timely appeal to this Court, and both Appellant and the trial court complied with Pa.R.A.P. 1925.  For the reasons provided below, we affirm.

The trial court summarized the evidence adduced during trial as follows:

---

[**] Retired Senior Judge assigned to the Superior Court.
[1] 18 Pa.C.S. §§ 3121, 3123, 6318, 4304, 3126, and 6301, respectively.

This case proceeded to trial on September 20, 2012. The following witnesses testified for the Commonwealth: complainant J. M., a minor, Alethia McQueen ('Alethia'), Police Officer Elizabeth Strange, Police Detective Joseph Jenkins, and Dr. Maria McColgan.

J. M. testified that, as a child, she lived at numerous addresses. N. T. 9/20/12 at 50. At age four, she lived at Fairview Court in New Jersey, after which she moved to Pennsauken, New Jersey, then the Tamarack Apartments in New Jersey, and then to 975 Jackson Street in New Jersey. N. T. 9/20/12 at 47-49. Following these moves, she lived on 16th Street in the City and County of Philadelphia, then at her step-grandmother's house, and finally her current address, 2326 West Thompson Street in Philadelphia. N. T. 9/20/12 at 50. She lived at her current address with her mother and Appellant, her stepfather. N. T. 9/20/12 at 51.

J. M. testified that in the Tamarack Apartments, when she was approximately seven years old, Appellant penetrated her anus with his penis. N. T. 9/20/12 at 52-54, 79. She was too young to know it was his penis, but she remembered the pain, and knew Appellant had been the one to hurt her. N. T. 9/20/12 at 53. This happened only once at that location. N. T. 9/20/12 at 55. At an unspecified later date, Appellant blindfolded J. M., but she was able to look down beneath the scarf and saw his penis, and then knew that he had penetrated her with his penis at this earlier date. N. T. 9/20/12 at 54.

The family moved to 957 Jackson Street, where the abuse occurred again. N. T. 9/20/12 at 55-56. Several times, Appellant called J. M. into the room he shared with J. M.'s mother. N. T. 9/20/12 at 58, 61. He then tied a scarf around J. M.'s eyes and told her he was checking her teeth, and it would hurt less when she could not see. N. T. 9/20/12 at 56. Though J. M. at first thought Appellant was checking her teeth with his thumb, she was later able to peek below the edge of the scarf, and saw he was actually

putting his penis into her mouth. N. T. 9/20/12 at 56-57. During these sessions of abuse, Appellant instructed J. M. to 'suck it like a lollipop and a popsicle.' N. T. 9/20/12 at 58-59. On another occasion, Appellant took J. M.'s clothes off and penetrated her anus and once, her vagina. N. T. 9/20/12 at 60, 62. J. M. did not tell anyone what was happening because she was frightened about what would happen to her. N. T. 9/20/12 at 59-60.

When J. M. was ten (10) years old, the family moved to 16th Street in Philadelphia. N. T. 9/20/12 at 65. On an unspecified date at 16th Street, J. M.'s mother went to work and J. M. lay down in her bed. N. T. 9/20/12 at 64-65. Appellant came up to the bed and forced his penis inside J. M.'s anus. N. T. 9/20/12 at 65. When J. M. woke up to find him doing this, she cried. N. T. 9/20/12 at 71. Later, Appellant wrote J. M. a letter saying he was sorry, but J. M. threw the letter out. N. T. 9/20/12 at 71. This was the first time she had showed him he was hurting her; during other assaults, she pretended to be asleep, N. T. 9/20/12 at 71. The assaults occurred multiple times at the 16th Street house. N. T. 9/20/12 at 65.

J. M. and her family also lived with Charlene McQueen, Appellant's mother, for a time. N. T. 9/20/12 at 65. In this residence, too, Appellant forced his penis inside of J. M.'s anus. N. T. 9/20/12 at 66-67.

J. M. and her family next moved to her grandmother's house. N. T. 9/20/12 at 67. Appellant did not live with them the entire time but on one night, he came to J. M.'s room [and] penetrated her anus with his penis. N. T. 9/20/12 at 67-68.

When J. M. was eleven (11) years old, the family moved to 2326 W. Thompson Street. N. T. 9/20/12 at 68. J. M. often slept on the couch in her one year old brother's room because she was afraid of the dark. N. T. 9/20/12 at 69-70. One night while J. M. and her brother slept, Appellant came into the room and assaulted J. M. in the same manner as earlier

occasions, penetrating her anus with his penis. N. T. 9/20/12 at 70-72. The assaults occurred numerous times at that location. N. T. 9/20/12 at 70-72.

On March 10, 2011, J. M., Appellant, and Alethia attended the Jehovah's Witness Kingdom Hall, where they read a Bible excerpt about rape. N. T. 9/20/12 at 72-73, 97. J. M.'s eyes welled with tears and her mother asked her what was wrong. N. T. 9/20/12 at 73, 97. When J. M. refused to speak, Alethia took J. M. into the bathroom. N. T. 9/20/12 at 73, 97. J. M., shaking and stuttering, still did not want to tell her mother why she was crying. N. T. 9/20/12 at 97. Finally, J. M. said, '[Appellant] isn't the person you thought he was.' N. T. 9/20/12 at 97. Though J. M. was still reluctant to talk, she finally admitted to Alethia that Appellant came into her room when he thought she was asleep and penetrated her anally. N. T. 9/20/12 at 73, 97.

Alethia was hurt and frightened, because J. M. was reluctant to go home with her mother, but wanted to live with her grandmother instead. N. T. 9/20/12 at 99. Despite her mental anguish, however, Alethia did not doubt her daughter was telling the truth. N. T. 9/20/12 at 99. That night, when they went home, Alethia slept in her daughter's room until J. M. fell asleep. N. T. 9/20/12 at 100. Eventually she went back to her own room, where she stayed awake for most of the night. N. T. 9/20/12 at 100. At this time, she did not say anything to Appellant regarding the information J. M. had revealed; she took him to work as she usually did. N. T. 9/20/12 at 100; N. T. 9/21/12 at 29. She then called Taylor Brandy ('Brandy'), the minister at Kingdom Hall, for advice. N. T. 9/20/12 at 100; N. T. 9/21/12 at 29. Brandy advised Alethia to call the police, which she did. N. T. 9/20/12 at 73, 100.

On March 11, 2011, Police Officer Elizabeth Strange received information of a rape at 2326 West Thompson Street. N. T. 9/20/12 at 27-28. Alethia told Officer Strange she should speak to J. M., because J. M. had something to tell her. N. T.

9/20/12 at 29. Shaking and terrified, J. M. proceeded, over the course of twenty (20) or twenty-five (25) minutes, to tell Officer Strange about her stepfather's abuse. N. T. 9/20/12 at 29-30. She said that at night, Appellant, her stepfather, would come into her room and tie a scarf around her eyes, telling her that they were 'playing dentist' and he was going to 'check her teeth.' N. T. 9/20/12 at 30-31. However, while J. M. was blindfolded, Appellant would insert his penis into her mouth. N. T. 9/20/12 at 30-31. She also admitted that Appellant forced his penis into her rectum and it was painful, and the abuse was ongoing and had occurred multiple times. N. T. 9/20/12 at 30, 36, 43.

Alethia learned for the first time of the blindfolding at Special Victims Unit ('SVU'). N. T. 9/20/12 at 100-101. She then recalled a day in the past, when J. M. was five or six, and she walked into the bathroom to find Appellant with J. M. N. T. 9/20/12 at 101-102. J. M. was blindfolded and Appellant was wearing a towel, and seemed startled Alethia had come home. N. T. 9/20/12 at 101-102. Although Alethia had a bad feeling about the incident and left for her mother's house with J. M., she did not want to believe her suspicions about her own husband. N. T. 9/20/12 at 102-103. Appellant attempted to explain that he was taking a look at J. M.'s loose tooth to see if it needed to be taken out. N. T. 9/20/12 at 103. Alethia went back to him, hoping her mind was playing tricks on her. N. T. 9/20/12 at 104.

Based on this interview, Officer Strange called the SVU and was told to bring J. M. down for an interview. N. T. 9/20/12 at 31-32. Officer Strange waited for part of the interview because she 'believed J. M. was telling the truth and [she] saw the hurt.' N. T. 9/20/12 at 32. J. M. looked like she 'didn't know what to do.' N. T. 9/20/12 at 32. Alethia also believed J. M. because J. M. had never been a troublesome child, and had never lied to Alethia before. N. T. 9/20/12 at 108.

Detective Joseph Jenkins interviewed J. M. at SVU. N. T. 9/20/12 at 74. During the interview, J, M. told Detective Jenkins about the incidents where Appellant would 'check her teeth,' blindfolding her and then placing his penis into her mouth. N. T. 9/21/12 at 60. She also reported the incidents of Appellant forcing his penis into her anus. N. T. 9/21/12 at 60. Subsequent to the interview, Detective ]enkins prepared an arrest warrant. N. T. 9/21/12 at 55.

After Appellant's arrest, he attempted to contact Alethia McQueen numerous times, but she did not answer the phone. N. T. 9/20/12 at 109. Eventually they communicated by letter, because despite what had happened, Appellant was still her son's father and she loved him. N. T. 9/20/12 at 110. Though they discussed other issues, including religion, Appellant's previous infidelities, or other issues in their marriage, Alethia could not bring herself to discuss what had happened to J. M. N. T. 9/20/12 at 111. Eventually, she stopped sending him letters. N.T. 9/20/12 at 112. Charlene McQueen, Appellant's mother, told Alethia two or three times [] that she and J. M. did not have to show up at court and no one could make them. N. T. 9/21/12 at 15. Because the abuse did not occur that day, J. M. was not taken to the hospital. N. T. 9/20/12 at 32. To collect biological and DNA evidence, the incident usually had to have occurred within 72 hours. N. T. 9/21/12 at 58.

On September 15, 2011, a nurse practitioner at St. Christopher's hospital examined J. M. N. T. 9/20/12 at 76; N. T. 9/21/12 at 84-85. J. M. was negative for STDs and her examination was 'overall normal,' with no findings of injury or trauma. N. T. 9/21/12 at 87-88. J. M. did have a creamy white discharge in her vaginal area, which was slightly excessive for a typical child going through puberty. N. T. 9/21/12 at 88.

Dr. Maria McColgan testified at trial that it is normal for child victims of sexual abuse to delay disclosure

and that they do not tell every detail right away, out of shame. N. T. 9/21/12 at 89-90. It is rare for a child to lie about sexual abuse. N. T. 9/21/12 at 90. Additionally, Dr. McColgan testified that more than 95% of the time she has examined a child victim of sexual abuse, the examination is 'normal' or not specific. N. T. 9/21/12 at 91. Fewer than 5% of the times, she has discovered definitive evidence of penetration. N. T. 9/21/12 at 91. Even after 24 hours, it is rare to recover sperm or DNA from a child. N. T. 9/21/12 at 100.

Prison tape recordings, involving Appellant, Alethia McQueen, Charlene McQueen, and Appellant's sister, were played for the jury on September 21, 2012. N. T. 9/21/12 at 49-52. The court reporter did not transcribe the substance of those tapes. N. T. 9/21/12 at 47-52.

Tanzania Cook and Charlene McQueen testified in Appellant's defense. Appellant took the stand in his own defense. Tanzania Cook testified she had known Appellant since childhood and, beginning in October or November 2010, had a physical relationship with him continuing until January 2011. N. T. 9/21/12 at 112-113. She never spoke with Alethia McQueen. N. T. 9/21/12 at 115.

Charlene McQueen ('McQueen') testified she is Appellant's mother and Appellant, Alethia, and J. M. lived with her for a time. N. T. 9/21/12 at 116-117. She visited Appellant in prison with Alethia. N. T. 9/21/12 at 118-119. She spoke over the phone with Appellant in prison and stated she felt he had a split personality and needed treatment. N. T. 9/21/12 at 123.

Appellant testified in his own defense. He denied his guilt on all charges and claimed the accusations were fabricated because Alethia was furious with him for his infidelities. N. T. 9/21/12 at 128-130, 132, 134, 138, 145.

Trial Court Opinion, pp. 3-8.

- 7 -

Appellant raises two issues in this appeal:

> DID THE TRIAL COURT COMMIT ERROR WHEN IT PERMITTED THE PROSECUTION TO INTRODUCE RECORDED PRISON PHONE CALLS OVER THE OBJECTION OF TRIAL COUNSEL WHEN TRIAL COUNSEL HAD JUST RECEIVED THE RECORDED PHONE CALLS THE VERY SAME DAY?
>
> DID THE TRIAL COURT COMMIT AN ABUSE OF DISCRETION BY IMPOSING UPON THE APPELLANT A MANIFESTLY EXCESSIVE SENTENCE OF THIRTY TWO AND ONE-HALF YEARS (32½) TO SIXTY FIVE (65) YEARS?

Brief For Appellant, p. 7.

In his first argument, Appellant claims that the trial court erred by refusing to preclude the Commonwealth from introducing tape recordings of conversations Appellant had in prison with other family members after his arrest. Appellant claimed that the Commonwealth violated its duty under Pa.R.Crim.P. 573 to produce these recordings sufficiently in advance of trial for Appellant's attorney to listen to the recordings and prepare his defense. N.T., 9/19/12, pp. 14-15. The delay in producing the recordings, Appellant says, was prejudicial due to the crucial nature of this evidence. In his words, the recordings "were material to the verdict because they have the appellant informing other family members that if J.M. does not appear the case will likely be dismissed. This is powerful evidence which the jury likely used to infer guilt." Brief for Appellant, p. 16.

Appellant has waived this argument. The recordings are not included in the certified record, and the court reporter did not transcribe the recordings during trial. Therefore, we are unable to ascertain the contents of the recordings or whether they were relevant and/or prejudicial to Appellant. Appellant has the responsibility to ensure that the record certified on appeal contains all of the materials necessary for the reviewing court to perform its duty. **Commonwealth v. Griffin**, 65 A.3d 932, 936 (Pa.Super.2013). The absence of the recordings and transcripts of the recordings is fatal to Appellant's argument. **Id**.

Even if Appellant preserved this argument for appeal, it is devoid of substance. Appellate courts generally review discovery rulings for an abuse of discretion. **Commonwealth v. Williams**, 732 A.2d 1167, 1175 n. 5 (Pa.1999). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." **Commonwealth v. Hess**, 745 A.2d 29, 31 (Pa.Super.2000).

Pa.R.Crim.P. 573(B)(1)(b), the rule governing discovery in criminal cases, requires the Commonwealth to produce "any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the

attorney for the Commonwealth." Under this rule, the Commonwealth must turn over all inculpatory evidence "that is relevant **and** within its possession." **Commonwealth v. Dent**, 837 A.2d 571, 585 (Pa.Super.2003) (emphasis in original). "Where the evidence is equally accessible or inaccessible to both the Commonwealth and the defense, the defense cannot use the discovery rules against the Commonwealth for its failure to produce the evidence." **Id**. (Commonwealth could not be held responsible for failing to provide retail store's surveillance videotape to defendant, when tape was not ever in Commonwealth's possession and was overridden shortly after the shoplifting incident; defendant did not move to produce the videotape or subpoena the videotape from the store, and videotape was equally inaccessible to both the Commonwealth and the defense); **see also Commonwealth v. McElroy**, 665 A.2d 813, 819-20 (Pa.Super.1995) (declining to hold prosecution responsible for tape recordings that were not in possession of prosecution, and suggesting proper procedure for defendant was service of subpoena *duces tecum* upon proper custodian of record).

In view of these authorities, the trial court acted within its discretion by denying Appellant's motion to preclude use of the tape recordings during trial. The trial court's reasoning on this subject is persuasive:

> The Assistant District Attorney did introduce tapes into evidence. However, she stated on the record that trial counsel had provided the District Attorney's Office with letters from Appellant's mother citing telephone conversations she had had with Appellant in custody. N. T. 9/19/12 at 14. Trial counsel's sole

argument was that, because the letters had been provided six months before the date of trial, and the introduction of the tapes occurred on the day of trial, it was not fair. N. T. 9/19/12 at 15. This Court overruled the objection, citing as its reasoning that the defense had provided the letters which triggered the additional investigation into the tapes in the first place. N. T. 9/16/12 at 16. Appellant, though he could have subpoenaed the Custodian of Records of the Philadelphia Prison System, did not. The records were not within the exclusive control of the prosecution and, as the tapes were inculpatory rather than exculpatory, the District Attorney's Office was not required to turn them over.

Trial Court Opinion, p. 15.

In his second argument on appeal, Appellant contends that the trial court abused its discretion by sentencing him to 32½-65 years' imprisonment. Appellant waived this argument by failing to raise it in his Pa.R.A.P. 1925(b) statement of matters complained of on appeal. *Commonwealth v. Lord*, 719 A.2d 306, 308-09 (Pa.1998). Because Appellant omitted this issue from his Pa.R.A.P. 1925(b) statement, the trial court did not explain the rationale for his sentence in its Pa.R.A.P. 1925(a) opinion, thus preventing us from reviewing this issue effectively.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/22/2014